In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 18-2045

DETLEF SOMMERFIELD,

*Plaintiff-Appellee,*

*v.*

LAWRENCE KNASIAK,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 08 C 3025 — **Joan B. Gottschall**, *Judge.*

———————————

ARGUED FEBRUARY 19, 2020 — DECIDED JULY 23, 2020

———————————

Before FLAUM, RIPPLE, and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* After experiencing virulent anti-Semitic abuse at the hands of Sergeant Lawrence Knasiak, Officer Detlef Sommerfield of the Chicago Police Department (CPD) filed a lawsuit against Knasiak and the City of Chicago in which he alleged discrimination, harassment, and retaliation based on his German national origin and his Jewish ethnicity. After the City was dismissed from the case, a jury returned a verdict for Sommerfield and awarded him $540,000

in punitive damages; he also received a modest award repre-
senting pre-judgment interest for backpay and pension bene-
fits he already had received. Knasiak has appealed, contend-
ing that he was entitled to judgment as a matter of law, or at
least a new trial, and that the court should have reduced the
punitive-damage award. We recognize that this was a closely
contested case, but in the end we find no error in the district
court's decisions, and so we affirm.

## I

We recount the facts in the light most favorable to the
jury's verdict. Sommerfield was born and raised in Germany,
where some of his family members had died in concentration
camps during the Holocaust. At some point he emigrated to
the United States, settled in Chicago, and joined the CPD. His
supervisor there was Sgt. Knasiak. For years, Sommerfield en-
dured vicious anti-Semitic abuse from Knasiak. We prefer not
to debase this opinion by repeating what Knasiak said: suffice
it to say that the vitriol invoked Hitler, the actions the Nazis
took in the death camps, and regret that Jews today live in the
United States. Although Sommerfield repeatedly pleaded
with Knasiak to stop the harassment, Knasiak never let up.

On March 13, 2004, Sommerfield's girlfriend was taken to
the emergency room after suffering a severe allergic reaction
to a medication. Sommerfield received permission from the
police captain to go visit her in the hospital during his shift.
When he returned, Knasiak said, "if you want to take care of
your f**king Mexican girlfriend, you take time off like every-
body else." This was the last straw for Sommerfield; he re-
sponded by filing a formal complaint, known as a CR, or
"complaint register," to the internal affairs division about
Knasiak's offensive comment about his girlfriend and the

relentless harassment. Filing the CR against Knasiak was a drastic step: one CPD sergeant testified at trial that he had never heard of another officer filing a CR against a superior.

On March 15, 2004, two days after filing his complaint, Sommerfield was riding in the passenger seat of a patrol car driven by another officer. Attempting to refuel the car at a gas station, the driver discovered that his gas card did not work. He suggested that, because Sommerfield lived in the area, they could go to Sommerfield's house to retrieve his gas card. Sommerfield agreed, they drove to his house, and Sommerfield ran inside for a moment and retrieved the card.

Sergeant Kelly, another police officer, was on Sommerfield's street at the time Sommerfield went into his house. Kelly immediately called Knasiak, who ordered Sommerfield and the driver to meet him back at the station in the commander's office. They complied. At the station, Knasiak had summoned four other superior officers to witness his discipline of Sommerfield. At trial, CPD officers testified that they had never heard of this happening before. Knasiak first interrogated the driver, and then dismissed him and turned to Sommerfield. Knasiak accused Sommerfield of violating rules by failing to contact the dispatcher while he was retrieving the gas card. Knasiak then filed a CR against Sommerfield alleging that he had been insubordinate by leaving the car without contacting the dispatcher and recommending that Sommerfield be suspended. This was the only time Knasiak had ever issued a CR, much less one with the serious charge of insubordination.

An apparently independent group of Department officials briefly investigated Knasiak's complaint and suspended Sommerfield for five days. This measure was unprecedented; in

fact, the record showed, it was common practice in the Department not to bother the dispatchers for such a short errand. Sommerfield was the only person Knasiak ever disciplined for the relatively minor infraction of "failure to report location to dispatch." The driver who suggested the brief stop received only a reprimand. There were other apparent lapses in the investigation, too. The investigating sergeant failed to interview a secretary whom Knasiak told to leave the office the night he disciplined Sommerfield, nor did the investigator interview two patrol officers who were sitting outside Knasiak's office at the time of the reprimand. Further, the report omitted evidence that Knasiak had shouted profanities at Sommerfield as he disciplined him, relying instead exclusively on the statements of the officers Knasiak had brought into the office, who insisted that it was Sommerfield, and not Knasiak, who had lost his temper.

Later Sommerfield was passed over for a promotion to the position of canine handler, even though he was rated "well-qualified." According to Department rules, in order to be eligible for that position, an officer could not have three or more complaints against him that resulted in suspension. The CPD's canine coordinator testified that Sommerfield did not get the promotion because he had had exactly three suspensions in the preceding five years, including the one that resulted from Knasiak's recommendation.

In 2006, Sommerfield filed a lawsuit against the City of Chicago and Knasiak (*Sommerfield I*). Because the statute of limitations had run on the only claim he raised against Knasiak, the court dismissed Knasiak from that case, which proceeded against only the City. Sommerfield won a jury verdict of $30,000. Still wishing to sue Knasiak, however,

Sommerfield brought the present action (*Sommerfield II*) against Knasiak and the City on May 23, 2008. In it, he complained that Knasiak had harassed him and discriminated against him on the basis of race, religion, and national origin, and had retaliated against him based on protected activities, and that the City was responsible for all this. The district court dismissed the claims against the City with prejudice on February 26, 2009, on the ground that they duplicated those in *Sommerfield I*, but it permitted the claims against Knasiak to proceed. A somewhat pared down version of that part of the case went to a jury trial. On July 24, 2014, the jury returned a verdict in Sommerfield's favor for $540,000 in punitive damages and $0 in compensatory damages.

At that point, before the district court entered final judgment on the verdict, three years of post-trial litigation ensued. It was concerned primarily with Sommerfield's efforts to add a belated indemnity claim against the City and to obtain prejudgment interest, and the efforts of the court to calculate (by the parties' agreement) Sommerfield's economic damages The district court entered its final judgment in *Sommerfield II* on May 12, 2017. It awarded Sommerfield a total of $548,703.96, which represented $540,000 in damages awarded by the jury and $8,703.96 in pre-judgment interest. The district court also concluded that Sommerfield was entitled to another $54,315.24 in economic damages, but it offset that award by a voluntary payment in the same amount that the City had made to Sommerfield while the case was pending. On June 9, 2017, Knasiak filed a timely motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b), a Rule 59(a) motion for a new trial, and a Rule 59(e) motion to alter or amend the judgment. The district court denied all three motions, and Knasiak now appeals.

## II

Relying on Rule 50(b), Knasiak first urges that it was wrong even to ask the jury to decide whether he was responsible for either of the adverse actions at issue. Knasiak focuses in both instances on Sommerfield's evidence of causation: if no reasonable juror could connect Knasiak to those adverse actions, then his motion for judgment as a matter of law should have been granted. The question is thus whether there was enough evidence in the record to permit the jury to conclude that, for the suspension, the nominal actors (the investigating officers) were simply following Knasiak's recommendations, and thus that no intervening actor insulated Knasiak from responsibility. See *Schandelmeier-Bartels v. Chicago Park Dist.*, 634 F.3d 372, 379 (7th Cir. 2011) (plaintiff must prove the "existence of a link between an employment decision made by an unbiased individual and the impermissible bias of a non-decisionmaking co-worker.") The second adverse action flows directly from the first: had Sommerfield not received the CR for the gas-card stop, he would have been eligible for the canine position and would have received it.

Knasiak urges that he was not the person who imposed Sommerfield's suspension or denied him the promotion. This alone, he contends, was enough to preclude the jury from concluding that he was responsible for the adverse actions, because he did not "participate[] directly in the constitutional violation." *Hildebrandt v. Illinois Dep't of Nat. Res.*, 347 F.3d 1014, 1039 (7th Cir. 2003). But the question is not that simple. As the district court pointed out in its opinion denying Knasiak's post-judgment motions, individual liability is possible if the subordinate employee, motivated by unlawful discriminatory intent, caused the nominal actors to take the

adverse action. That can happen, for example, if the evidence shows that the nominal decisionmakers played no real role in the action, but instead simply rubber-stamped the action of the subordinate.

There was ample evidence in the record from which the jury could have concluded (and did conclude) that Knasiak filed the CR after the gas-card incident out of discriminatory animus, and that it was this action that triggered the two adverse actions at issue. In filing that CR, he intended to bring about the predictable results—namely, Sommerfield's suspension and ineligibility for the canine handler position. *Staub v. Proctor Hosp.*, 562 U.S. 411, 417 (2011) ("Intentional torts such as this, as distinguished from negligent or reckless torts, generally require that the actor intend the consequences of an act, not simply the act itself.") (internal alterations and quotation marks omitted).

There was also evidence to support the jury's conclusion that Knasiak, not the committee that investigated the CR, was the real decisionmaker. Knasiak himself testified that his recommendations for suspensions were almost always taken. And Sommerfield presented evidence that this practice was followed in his case, given that Knasiak spoke with the police sergeants investigating his CR. The jury was entitled to conclude that Knasiak intended to get Sommerfield suspended because of his Jewish heritage and that he knew his suspension recommendation would be accepted because of the consistent practice in the Department and his close relationships with the investigators.

Sommerfield also presented enough evidence to permit the jury to conclude that Knasiak knew about his ambition to become a canine handler. Another superior officer testified

that he knew that Sommerfield was on the "well-qualified list" for a promotion to canine handler. The officer additionally testified that it was well-known around the precinct that Sommerfield had been angling for the position. Finally, the officer confirmed that it was well-known that multiple suspensions would disqualify an applicant from the canine handler job. Although there is no direct evidence that Knasiak knew that Sommerfield wanted the job, there was enough circumstantial evidence for a jury to find that Knasiak had the requisite knowledge and intent.

We are not saying that this evidence was overwhelming, but that is not the standard. We do not lightly set aside jury verdicts, and we are satisfied that this is not one of the rare cases in which that must be done. We also find much of the discussion in the briefs in this court about the so-called cat's-paw idea to be beside the point. Courts need to resist the temptation to turn colorful metaphors into "doctrines" or "theories." Just as we said in *Ortiz v. Werner Enterprises*, 834 F.3d 760 (7th Cir. 2016), "[the] legal standard … is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Id.* at 765. Though *Ortiz* arose under section 1981, we clarify here that the same standard applies to cases brought under section 1983. See *Smith v. Bray*, 681 F.3d 888, 899 (7th Cir. 2012) ("In general, the same standards govern intentional discrimination claims under Title VII, § 1981, and § 1983."), overruled on other grounds by *Ortiz, supra*. The evidence before this jury permitted it to conclude that Knasiak engineered Sommerfield's wrongful suspension and his loss of the promotion. The district court thus correctly denied Knasiak's motion for judgment as a matter of law.

Knasiak argued in the alternative for a new trial, citing Federal Rule of Civil Procedure 59(a). Relying largely on its discussion of the evidence in connection with the Rule 50(b) motion, the district found that no new trial was warranted. We review this type of ruling only for abuse of discretion. See *Browning-Ferris Ind. of Vermont, Inc., v. Kelco Disposal, Inc.*, 492 U.S. 257, 279 (1989). We see no problem of that magnitude here.

### III

Even if he is not entitled to set aside the verdict as a matter of law or to obtain a full new trial, Knasiak insists that the punitive-damages component of the jury's verdict is excessive, disproportionate, and violates due process principles, and for those reasons must be set aside or reduced pursuant to Rule 59(e). This is essentially a request for a remittitur. We generally review a district court's decision to grant or deny remittitur for abuse of discretion. *Pickett v. Sheridan Health Care Ctr.*, 610 F.3d 434, 446 (7th Cir. 2010). A constitutional challenge to a denial of a motion for remittitur, however, is reviewed *de novo*. *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 435 (2001).

We analyze the constitutionality of an award of punitive damages according to the three-part test set out by the Supreme Court in *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996). There, the Supreme Court held that an award of punitive damages will violate the Due Process Clause of the Fourteenth Amendment only if it is "grossly excessive" in relation to a state's legitimate interest "in punishing unlawful conduct and deterring its repetition." *Id*. at 568. In applying that standard, the district court should consider: (1) the degree of reprehensibility of the defendant's misconduct; (2) the

disparity between the harm (or potential harm) suffered by the plaintiff and the punitive-damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. *Id*. at 574–75.

Following these instructions, the district court found first that Knasiak's behavior was "extremely reprehensible," because he had "abused a position of power, one of public trust," and because his harassment "persisted for years and escalated in tone and frequency." As for the second point, the court found that the ratio between the punitive-damages award and the compensatory-damages award stood at 5.8, which it determined was not irrational. Finally, the court found that the punitive-damages award was not excessive compared to other cases.

Knasiak argues that the district court erred in all three of these determinations. First, he argues that the Supreme Court in *Gore* set out a "hierarchy of reprehensibility," according to which acts and threats of violence stand at the top. See *Gore*, 517 U.S. at 575–76 ("This principle reflects the accepted view that some wrongs are more blameworthy than others. Thus, we have said that nonviolent crimes are less serious than crimes marked by violence or the threat of violence.") (internal quotation marks omitted)). Mere verbal harassment, according to Knasiak, cannot support such a large punitive-damages award, as it falls lower in the hierarchy. Second, he argues that the punitive damages were not reasonably related to the compensatory damages. Finally, he cites a statute that he says shows that the punitive damages levied against him are disproportionately large.

We do not find Knasiak's arguments persuasive. We do not read *Gore* as establishing such a rigid hierarchy of reprehensibility. The Court observed only that the "degree of reprehensibility" is "the most important indicium of the reasonableness of a punitive damages award." *Id*. at 575. It noted that certain types of conduct could support larger punitive-damages awards than others. *Id*. Indeed, the Court later clarified that *Gore* merely set out a series of "factors" to be considered when evaluating whether conduct was sufficiently reprehensible to warrant a punitive-damages award. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003).

Although Knasiak's harassment never turned physically violent, his conduct was nevertheless "extremely reprehensible." See *Farfaras v. Citizens Bank & Trust of Chi.*, 433 F.3d 558, 561 (7th Cir. 2006) (holding that continuous sexual harassment by three superiors constituted extremely reprehensible conduct); *Neuros Co., Ltd. v. KTurbo, Inc.*, 698 F.3d 514, 516–17 (7th Cir. 2012) (holding that a company's dissemination of false information about a competitor's products could support a five-to-one punitive-damages award). Knasiak verbally abused Sommerfield with vicious anti-Semitic slurs for a period lasting years. He degraded him for his Jewish heritage in front of his co-workers and insulted his girlfriend for her race. The absence of physical abuse does not render Knasiak's behavior any less reprehensible.

No legal principle requires the conclusion that this punitive-damages award was excessive relative to the harm that Knasiak inflicted. Under *Gore*, a court analyzes the ratio of punitive damages to "the actual harm inflicted on the plaintiff." *Gore*, 517 U.S. at 580. The district court determined that the actual economic harm inflicted on Sommerfield as a result of

his suspension and his loss of the canine handler position was $54,315.24. The court additionally concluded that the $30,000 that the jury awarded Sommerfield in *Sommerfield I* belonged in the calculation of actual harm. Thus, according to the district court, the final ratio between the punitive damages and actual harm stood at $540,000 to $93,019.20, roughly 5.8 to 1. The court concluded that this was well within constitutional bounds.

Knasiak contends nonetheless that the punitive damages here bear no "reasonable relationship" to the compensatory damages. He argues that he could not be held liable for the $54,315.24 that the City of Chicago paid Sommerfield in back-pay and other compensation. He draws from that fact the conclusion that he could not be held liable for Sommerfield's suspension or his failure to get the canine handler position. Additionally, Knasiak argues, because the jury awarded Sommerfield only punitive damages and no compensatory damages, it must have been motived by animus toward Knasiak.

Punitive-damages awards, however, are not conditioned upon the presence of compensatory damages. *Timm v. Progressive Steel Treating, Inc.*, 137 F.3d 1008, 1010 (7th Cir. 1998). The jury's award of punitive damages without compensatory damages is thus not suspect, at least not on that basis. We already have held that there was enough evidence to hold Knasiak liable for Sommerfield's loss of pay resulting from his failure to obtain the canine handler position. Even without considering the $30,000 award that Knasiak received from the City of Chicago, the ratio would be $540,000 to $54,315.24, or 9.94 to 1. Mathematical ratios are not "the be-all and end-all in punitive-damages analysis." *Shea v. Galaxie Lumber & Constr. Co.*, 152 F.3d 729, 736 (7th Cir. 1998). We have upheld

substantially larger ratios between actual damages and puni-
tive damages in similar cases. See, *e.g.*, *Mathias v. Accor Econ.
Lodging, Inc.*, 347 F.3d 672 (7th Cir. 2003) (upholding a ratio of
37.2 to 1 where a hotel had been found grossly negligent in
failing to rid itself of bedbugs); *Fine v. Ryan Int'l Airlines*, 305
F.3d 746 (7th Cir. 2002) (upholding a ratio of 50 to 1 in a case
of sex discrimination). The single-digit ratio here, in light of
the severity of the harassment, was consistent with awards in
other cases and did not violate due process.

With respect to the third *Gore* factor, Knasiak argues that
the amount of punitive damages imposed upon him exceeds
the amount authorized elsewhere for comparable miscon-
duct. Knasiak points to Title VII's statutory damages cap,
which limits damages in employment discrimination cases to
a maximum of $300,000. 42 U.S.C. §1981a(b)(3). He argues
that, by analogy, punitive damages should be so limited here.

We do not accept the first step of his argument: that Title
VII's damages cap is relevant in this situation. That cap repre-
sents a policy judgment on Congress's part to limit the
amount of damages that a defendant must pay in a Title VII
case. Title VII applies to entities, rather than individuals, and
the cap reflects the difference in the incentives an entity may
have to take corrective action after an incident of employment
discrimination. A jury may still award more than $300,000 un-
der Title VII's system, but the court must reduce the amount
to $300,000. If Congress had wished to cap the damages avail-
able under section 1981, then it would have done so. But it did
not, and we see no warrant for what would amount to a judi-
cial amendment to the statute.

Finally, Knasiak argues that we should consider his finan-
cial circumstances in assessing the legitimacy of the punitive

damages. Knasiak is now retired. He has indicated that he works only sporadically and that he has a mortgage on his house, medical bills unpaid by insurance, and a negative net worth. The jury apparently chose $540,000 because it amounts to ten years of his pension. Knasiak argues that a damages award of $540,000 would mean financial ruin for him, and that the district court should have taken that into consideration. But a comparison between the level of punitive damages and the defendant's financial resources is not mentioned in *Gore*. See also *id.* at 591 (Breyer, J., concurring) (the financial position of the defendant "is not necessarily intended to act as a significant *constraint* on punitive awards. Rather, it provides an open-ended basis for inflating awards when the defendant is wealthy."). We have held that "sanctions should be based on the wrong done rather than on the status of the defendant; a person is punished for what he does, not for who he is." *Mathias*, 347 F.3d at 676. We note as well that if Knasiak is or becomes insolvent, his remedy is bankruptcy, which ensures that all creditors receive their contractual and statutory due, rather than leaving one unpaid. Thus, the district court was within its discretion in declining to grant remittitur.

## IV

We AFFIRM the decision of the district court.