In the

# United States Court of Appeals

### For the Seventh Circuit

No. 15-3311

MARIA N. GRACIA,

*Plaintiff-Appellee,*

*v.*

SIGMATRON INTERNATIONAL, INC.,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:11-cv-07604 — **Edmond E. Chang**, *Judge.*

ARGUED SEPTEMBER 8, 2016 — DECIDED NOVEMBER 29, 2016

Before FLAUM, ROVNER, and SYKES, *Circuit Judges.*

ROVNER, *Circuit Judge.* Maria Gracia sued her employer, SigmaTron, International, Inc., for sexual harassment and for terminating her in retaliation for reporting sexual harassment. A jury found in favor of SigmaTron on the claim of sexual harassment but returned a verdict for Gracia on the retaliation count. SigmaTron challenges both the judgment in Gracia's favor and the amount of damages awarded by the jury. We affirm.

## I.

Maria Gracia entered the workforce at the age of sixteen. After holding jobs at Burger King, Dollar Tree and various staffing companies, Gracia began working on the assembly line for the defendant, SigmaTron, in 1999. SigmaTron is an international, publicly-traded company that manufactures printed circuit board assemblies. The company has approximately 2500 employees at manufacturing facilities in the United States, Mexico, Taiwan and Vietnam. Its products are used in aviation, home appliances and medical devices, among other applications. A highly regarded employee at SigmaTron,[1] Gracia was promoted multiple times over the years until she achieved the position of assembly supervisor in 2004 or 2005.

In her capacity as assembly supervisor, Gracia was responsible for product output and quality, for scheduling personnel and for directing team members in their work, among other things. Team members on the assembly line connected electronic components to circuits boards according to the customers' requirements. Solder, the material used to attach components to circuit boards, may be made with lead or without lead. In some instances, customers requested that a particular solder

---

[1] SigmaTron's corporate human resources manager, Sandra Miedema, described Gracia as "absolutely great at her job," "terrific," and "excellent" prior to the events at the core of this case. Patrick Silverman, her manager, testified that, prior to the second half of 2008, Gracia's attendance was excellent, her cooperation was good, her initiative was very good, her job knowledge was excellent, her work quality was good to excellent, and her work quantity or output was good.

be employed, and it was the assembly supervisor's job to make sure that all customer requirements were met.

Gracia reported to Patrick Silverman, a production manager. In late 2007, Silverman began engaging in problematic conduct towards Gracia. He sent her a series of emails containing graphic photographs of partially nude women in degrading poses. In early 2008, he sent Gracia an email with a photo of her younger sister on which someone had superimposed an image of a male co-worker dressed as a baby, with the caption, "Mother, milk please," in Spanish.[2] Gracia testified that the unwelcome pictures made her feel embarrassed, uncomfortable and upset. But she did not object to Silverman when he sent the photos and did not inform the company's human resources department because Silverman was her boss. Gracia had noticed that Silverman and the company's executive vice-president, Greg Fairhead, were good friends, and she feared

---

[2]  Silverman conceded at trial that he sent these photographs to Gracia because he found them "humorous." After the litigation commenced and SigmaTron became aware that Silverman had sent these photographs to a female subordinate, he was advised in general not to use work email for non-business reasons. As of the time of the trial, no one at the company had mentioned these particular emails or photographs to him and no one at SigmaTron had ever disciplined him for sending these photographs. Miedema testified at trial that, although she found the pictures "disgusting," she did not think they were sexual in nature. She refused to say that a male supervisor sending these photographs to a female subordinate violated the company's sexual harassment policy.

she would lose her job.[3] Greg Fairhead is the brother of Gary
Fairhead, the CEO of SigmaTron.

In mid-2008, Silverman started writing Gracia up for
tardiness. Gracia did not deny that she had been late on
multiple occasions, sometimes as little as a minute and at times
for longer intervals. But Silverman had not previously objected
to her schedule and prior to mid-2008, Gracia's attendance
record had been described by Silverman as "excellent." One
evening in the fall of 2008,[4] Gracia received a series of late night
calls at home from Silverman. He asked her to join him at a
party with David Niemi, a man who had previously worked at

---

[3] Gracia testified extensively about additional harassing actions allegedly
taken by Silverman. For example, she testified that Silverman repeatedly
asked her out on dates. She declined each time but was afraid to say more.
She also testified that Silverman once pulled away the neck of her
turtleneck shirt in front of a co-worker and asked her if she was hiding bite
marks. According to Gracia, Silverman attempted to invite himself to her
apartment for an overnight stay, suggesting that he would rather stay with
Gracia after attending a Cubs game than drive home to Rockford, a distant
suburb. On occasion, he sent her texts or emails asking her to go out to
dinner or meet him at a bar. Each time, she declined. Gracia did not report
this conduct to her employer. Because the jury found for SigmaTron on the
sexual harassment claim, we will not credit Gracia's testimony on this issue
unless her testimony is unopposed. We include her testimony to provide
context for her claim of retaliation.

[4] Gracia could not recall the exact date of the late-night calls but testified
that they occurred approximately one month before two October 2008
meetings that she had with Sandra Miedema, the company's human
resources manager.

SigmaTron. She declined the invitation.[5] On October 15, a few weeks after she declined Silverman's late-night party invitation, several months after receiving the explicit emails, and after years of being an exemplary employee, Gracia was suspended for two days for tardiness. When she returned to work after the suspension, she requested a meeting with SigmaTron's corporate human resources manager, Sandra Miedema.

At the October 20 meeting, Gracia told Miedema for the first time about the late-night phone calls from Silverman and that Silverman had been treating her differently. She explained that he had begun writing her up for tardiness even though her timeliness had not been an issue before. Miedema noticed that Gracia's appearance had deteriorated since she had seen her last, that she looked dull and lacked luster. Even her clothing, jewelry and makeup had changed. Four days later, Miedema called Gracia in for a second meeting. Gracia again discussed the late-night phone calls and told Miedema that Silverman had been treating her differently and that he was sexually harassing her.[6] Miedema asked Gracia, "Is he sweet on you?"

---

[5] Silverman denied making any call, saying that Niemi made one call to Gracia from a party using Silverman's phone. Niemi denied at trial that he made any call to Gracia from a party. SigmaTron insists that any such call took place in 2004, but the jury was entitled to believe Gracia on this point. It was also entitled to credit Niemi and Gracia over Silverman. Neither Fairhead nor Miedema called Niemi to check out Silverman's story.

[6] The defendant vehemently denies in its briefs that Gracia complained to Miedema about sexual harassment. But at trial, Gracia responded affirma-

(continued...)

and Gracia replied, "Yes." Miedema also asked Gracia if she was on drugs. Gracia denied that she was taking drugs and offered to undergo drug testing. Miedema then dropped the subject.

At the end of that second meeting, Miedema bypassed her own supervisor and brought Gracia to the office of Greg Fairhead, SigmaTron's executive vice-president. Miedema said that she did not like the idea of Silverman "pushing at Maria." Gracia repeated to Fairhead that Silverman had subjected her to multiple unwanted late-night phone calls at home. Fairhead replied that Silverman had called her only once. Gracia tried to tell Miedema and Fairhead more about Silverman's inappropriate conduct but Fairhead spoke over her and gave her no chance to interject. After a break in the meeting, during which Miedema and Fairhead spoke privately to Silverman, Gracia was brought back in to speak with Miedema, Silverman and Fairhead. Ultimately, Gracia was told to shake hands with Silverman and work together.

Dissatisfied with the company's response to her claim of sexual harassment, Gracia filed a charge with the Equal Employment Opportunity Commission ("EEOC"), alleging sex and national origin discrimination. SigmaTron received a copy of the EEOC charge on November 19, 2008. Approximately two

---

[6] (...continued)

tively to a question about whether she "explicitly complain[ed] about sexual harassment" to Miedema in the October 24th meeting. As we explain in section II.A. below, in reviewing the denial of a motion for judgment as a matter of law, we construe the facts in favor of the party that prevailed at trial. And so we credit Gracia's version of the facts on the retaliation claim.

weeks later, on December 4, Silverman purportedly told Fairhead that he had received a report from Eduardo Trujillo, another SigmaTron supervisor, that Gracia had allowed an employee to use the wrong solder on a customer's order, using unleaded solder on a board that called for solder with lead. Silverman claimed that when Trujillo pointed out the problem to Gracia, she had not taken the matter seriously. Silverman asserted that when Trujillo told him about the problem, he (Silverman) went to the production floor, segregated the contaminated product and took care of the problem. After Silverman conveyed this purported sequence of events to Fairhead, Trujillo confirmed Silverman's story to Fairhead. The next day, approximately six weeks after Gracia's first complaint to Miedema about Silverman's sexual harassment and two weeks after the company received Gracia's EEOC charge, SigmaTron terminated Gracia's employment.[7]

At trial, however, Trujillo, a SigmaTron supervisor, denied making any report to Silverman about Gracia or employees on her assembly line, and did not recall Gracia speaking to him about the soldering incident. Instead, Trujillo testified that he was called into Fairhead's office on December 5 and asked "about the wrongdoing of boards being soldered." He re-

---

[7] Fairhead memorialized his explanation for the termination in a memo, claiming that Gracia was fired for "not following the strict standard on solder technology." The memo also stated that Trujillo brought the error to Gracia's attention and that she did nothing to stop the work, instead telling Trujillo, "I have done this many times before and nobody ever found out." According to the memo, Trujillo reported the error to Silverman who then rectified the situation. Fairhead represented in the memo that he questioned Trujillo, who confirmed Silverman's report.

sponded to Fairhead that he "was aware, as well as the whole group of inspectors." According to Trujillo, employees often used the wrong solder on circuit boards at SigmaTron, and that to the best of his knowledge, no one had ever been fired because of the inadvertent use of the incorrect solder on a circuit board. Trujillo also testified that, approximately one month before Gracia was fired, Silverman advised Trujillo to stay away from Gracia because he (Silverman) was "throwing bombs at" her.

Gracia testified that, on December 4, Trujillo brought to her attention that an employee was using the wrong solder, and that she addressed the problem immediately and appropriately. She removed the products from the employee applying the wrong solder and delivered them to the correct area. She also determined which employee had made the mistake, a group leader who accepted responsibility. According to Gracia, Silverman never came to the production floor and was not involved in rectifying the problem. As we discuss below, because Gracia prevailed at trial on her retaliation claim, we credit the version of the facts that support the jury's verdict. The jury was free to believe Gracia and Trujillo, and correspondingly free to determine that Silverman and Fairhead had lied about the incident.[8]

In response to the retaliation claim, SigmaTron asserted at trial that the company terminated Gracia's employment because she had allowed an assembly line worker to use the

---

[8] As we will discuss below, Gracia presented additional evidence that the company's stated reason for her termination was a pretext.

wrong solder, did not resolve the problem and did not take the matter seriously. As for the harassment claim, the company argued that Silverman's alleged conduct did not meet the standard for hostile work environment, that Gracia had little evidence corroborating her claims, and that Gracia did not avail herself of the company's sexual harassment policy because she never informed her employer that Silverman had done anything other than invite her to a party and treat her differently by writing her up for tardiness. The jury found in favor of SigmaTron on the sexual harassment claim and in favor of Gracia on the retaliation claim. The jury awarded Gracia $57,000 in compensatory damages and $250,000 in punitive damages.[9] SigmaTron appeals.

## II.

On appeal, SigmaTron contends that it is entitled to judgment as a matter of law on the retaliation claim because the evidence was insufficient to support the jury's verdict. SigmaTron also maintains that the compensatory and punitive damages awards are unsupported by the evidence, and that the punitive damages are both disproportionate to the harm suffered by Gracia and out of line with damages awarded in similar cases. Finally, in the alternative, SigmaTron argues that it is entitled to a new trial.

## A.

We review *de novo* the denial of a motion for judgment as a matter of law. *Empress Casino Joliet Corp. v. Balmoral Racing*

---

[9] In keeping with the statutory cap, the compensatory damages award was remitted to $50,000. The total amount of damages awarded was $300,000.

*Club, Inc.*, 831 F.3d 815, 822 (7th Cir. 2016); Fed. R. Civ. P. 50. In its opening brief, SigmaTron asserted that we must review the evidence in the light most favorable to the party against whom judgment was granted, in this instance, SigmaTron. The company's statement of the standard is incorrect and in fact inverts the true standard. Once a jury has spoken, reviewing the record as a whole, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000). Moreover:

> the court must disregard all evidence favorable to the moving party that the jury is not required to believe. … That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.

*Reeves*, 530 U.S. at 151 (2000) (internal quotation marks omitted); *Empress Casino*, 831 F.3d at 822 (in reviewing the denial of a motion for judgment as a matter of law, we construe the trial evidence strictly in favor of the party who prevailed before the jury); *Tart v. Illinois Power Co.*, 366 F.3d 461, 464 (7th Cir. 2004) (once a jury has spoken, the court is obliged to construe the facts in favor of the parties who prevailed under the verdict). We will affirm if a reasonable jury would have a legally sufficient evidentiary basis to find for the party on a particular issue. *Empress Casino*, 831 F.3d at 822. *See also Lust v. Sealy, Inc.*,

383 F.3d 580, 583 (7th Cir. 2004) (noting that we will affirm a jury's finding on causation when that finding cannot be said to be unreasonable).

On the retaliation count, Gracia prevailed at trial and so we must credit the evidence in her favor on that claim and disregard all evidence favoring SigmaTron that the jury was not required to believe. Employing that standard, Gracia easily prevails on her retaliation claim, and the district court was right to deny SigmaTron's motion for judgment as a matter of law. In order to make out a claim for retaliation, Gracia was required to prove (1) that she engaged in statutorily protected activity; (2) that her employer took an adverse employment action against her; and (3) that the protected activity and the adverse employment action are causally connected. *Ripberger v. Corizon, Inc.*, 773 F.3d 871, 881 (7th Cir. 2014); 42 U.S.C. § 2000e-3(a). For the causation factor, Gracia was required to demonstrate that "the desire to retaliate was the but-for cause of the challenged employment action." *University of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528 (2013). "This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id*. at 2533.

There is no doubt that Gracia engaged in statutorily protected activity when she complained to SigmaTron's human resources manager that her supervisor was sexually harassing her and when she filed her charge with the EEOC. Nor is there any question that SigmaTron took an adverse employment action against her when it terminated her employment. The company concedes these first two factors. Instead, SigmaTron argues that Gracia failed to demonstrate that she was fired

*because* she engaged in protected activity. The company contends instead that she was terminated because of her record of tardiness and because she allowed an employee to use unleaded solder on a leaded circuit board.

"[R]etaliatory motive may be established through circumstantial evidence such as suspicious timing, ambiguous statements, evidence that the stated reason for the employment decision is pretextual and" other evidence from which an inference of discriminatory intent might be drawn. *Ripberger*, 773 F.3d at 881. *See also Castro v. DeVry University, Inc.*, 786 F.3d 559, 565 (7th Cir. 2015) (same). We may dispense with SigmaTron's first explanation for the termination easily. SigmaTron did not rely on tardiness as a reason for the termination at trial. In fact, Fairhead, the person who decided to terminate Gracia, conceded at trial that he did not fire her on account of tardiness or attendance problems. R. 190, at 364 ("Q: You did not fire Maria on account of tardiness or attendance problems, did you? A: I did not."). In pre-trial proceedings, the company assured the court that it was not relying on tardiness as a cause of the termination but was instead focusing solely on the "soldering incident." In light of the company's pre-trial concession and the unequivocal admission by the decision-maker at trial, SigmaTron's repeated argument on appeal that tardiness was a cause for the termination is puzzling. With SigmaTron having conceded the point to the jury at trial, we may ignore the purported tardiness rationale on appeal.

We turn to SigmaTron's claim that Fairhead terminated Gracia because she allowed an employee to use the wrong solder and failed to respond appropriately when the problem was pointed out to her. We detailed SigmaTron's version of

events above, namely, that Trujillo approached Silverman and reported that Gracia had refused to fix a soldering error, that Silverman then fixed the problem and reported the situation to Fairhead, who then interviewed Trujillo and decided to fire Gracia. But Gracia testified that when Trujillo told her an employee was using lead-free solder on a leaded board, she stopped the employee, segregated the product, redirected employees and sought out the source of the problem. She confirmed that Silverman never came to the production floor to address the incident. Trujillo denied that he ever spoke to Silverman about the incident and denied telling Fairhead that Gracia made the error. Both Trujillo and Gracia denied that Gracia ever took the matter lightly or said it was "no big deal" (as Silverman claimed she said to Trujillo) or that it "doesn't matter" (as Fairhead claimed Silverman reported to him). The jury was free to credit the testimony of Trujillo and Gracia and conclude that Gracia did not mishandle the incident and that no one had reported that Gracia mishandled it.

Moreover, even if Gracia had allowed the use of unleaded solder on a leaded circuit board, she presented evidence that such an error occurred with regularity at SigmaTron, at times with the tacit approval of the company's management. She also presented evidence that the company had never terminated an employee on that ground. Michael Murphy, a former engineering manager at SigmaTron, testified that, although the company strived to use materials according to customer specifications, leaded parts were sometimes used on unleaded circuit boards or vice versa. Inadvertent substitutions occurred on the assembly line and, at times, the wrong parts were used because of supply issues. He explained that, when the company had a

supply of leaded parts and that lead-free versions had not yet come in, they would simply use the leaded parts in order to avoid wasting an expensive supply of leaded parts. Neverthe-less, during Murphy's tenure, which overlapped with Gracia's, incorrect parts were sometimes used and customers received fudged certifications representing that the correct parts had been used. Murphy testified that it was not a "big deal" to use unleaded solder on leaded boards but that it might present an ethical problem for the reverse to occur, *i.e.*, to use leaded solder on an unleaded board. To his knowledge, no one had ever been fired for using the wrong solder. This was consistent with testimony from Trujillo and Gracia that no one had ever been fired for using the wrong solder.

The jury was free to believe Gracia, Trujillo and Murphy, and it is apparent from the verdict that the jury credited their testimony on the retaliation claim. Equally importantly, the jurors were free to disbelieve Silverman, Fairhead and Miedema and conclude that their explanation for the termina-tion was a pretext. Gracia presented substantial evidence that she did not engage in the misconduct of which she was accused and that, even if she did, that conduct was not generally seen as cause for termination at the company. When a jury con-cludes that the employer's stated reason for the termination is a pretext, the jury may consider that pretextual explanation as evidence of retaliatory motive. *Reeves*, 530 U.S. at 147 ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive.").

> In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation

that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as "affirmative evidence of guilt." … Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision.

*Reeves*, 530 U.S. at 147-48 (internal citations omitted). The jury could reasonably conclude that SigmaTron's stated reason for the termination was a pretext, and it was then free to infer that the company gave a false reason in order to cover up a discriminatory purpose.

Gracia also provided circumstantial evidence of the company's retaliatory motive through the timing of her discharge. Although suspicious timing alone is rarely enough to create an inference of retaliatory motive, it can sometimes raise an inference of a causal connection, especially in combination with other evidence. *Magyar v. St. Joseph Reg'l Med. Ctr.*, 544 F.3d 766, 772 (7th Cir. 2008); *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011). "We have rejected any bright-line rule about how close the events must be to establish causation, but in cases where there is 'corroborating evidence of retaliatory motive,' an 'interval of a few weeks or even months may provide probative evidence of the required causal nexus.'" *Castro*, 786 F.3d at 565. In this instance, only two weeks after SigmaTron received Gracia's EEOC charge, the company terminated her, claiming falsely that she had engaged

in misconduct. Additionally, Murphy testified that others had engaged in similar conduct (using incorrect parts) or worse (certifying falsely to customers that correct parts had been used) and had not been fired. Gracia thus presented all three kinds of circumstantial evidence of retaliatory motive mentioned in the case law: suspicious timing, a pretextual explanation for the termination, and evidence that similarly situated employees were treated differently. *Castro*, 786 F.3d at 565. That was a legally sufficient evidentiary basis upon which a reasonable jury could find retaliatory motive. *Empress Casino*, 831 F.3d at 822.

For the sake of completeness, we add that the person who brought Gracia's supposed infraction to Fairhead's attention was none other than the manager Gracia had accused of sexual harassment only weeks earlier in her EEOC charge and in her conversations with Miedema and Fairhead. Although the company was aware that Gracia had accused Silverman of sexual harassment, Fairhead conducted a perfunctory investigation into Silverman's claim that Gracia had allowed the use of the wrong solder and had refused to take the incident seriously. Although Trujillo did not confirm Silverman's story, Fairhead terminated the highly regarded employee almost immediately. All of this evidence was more than sufficient to prove the causal link between Gracia's protected conduct and the company's decision to terminate her employment.

**B.**

The jury awarded Gracia $57,000 in compensatory damages and $250,000 in punitive damages. Because the statute caps total damages at $300,000 for a defendant with more than 500

employees, and because the parties agreed that any reduction should be made to the compensatory part of the award, the district court remitted the compensatory damages to $50,000. *See* 42 U.S.C. § 1981a(b)(3). SigmaTron argues that the district court erred when it failed to order a further remittitur of both the compensatory and punitive damages awards, which the company characterizes as excessive, unjustified by the evidence and inconsistent with awards in similar cases. We review for abuse of discretion the district court's decision not to grant a motion for remittitur of compensatory damages. *E.E.O.C. v. AutoZone, Inc.*, 707 F.3d 824, 833 (7th Cir. 2013); *Thompson v. Memorial Hosp. of Carbondale*, 625 F.3d 394, 408 (7th Cir. 2010); *Houskins v. Sheahan*, 549 F.3d 480, 496 (7th Cir. 2008). We review challenges to punitive damages *de novo* when constitutional issues are raised. *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 435 (2001); *Kapelanski v. Johnson*, 390 F.3d 525, 534 (7th Cir. 2004). If no constitutional issue is raised, our review of punitive damages is for abuse of discretion. *Cooper*, 532 U.S. at 433. It is unclear whether SigmaTron's challenge to the punitive damages award is based on constitutional or non-constitutional grounds. In this instance, however, the standard of review does not affect the outcome.

We begin with the challenge to the compensatory damages award. In reviewing the district court's refusal to remit compensatory damages, we consider, among other things, whether the award is "monstrously excessive," whether there is a rational connection between the award and the evidence, and whether the award is roughly comparable to awards made in similar cases. *AutoZone*, 707 F.3d at 833; *Thompson*, 625 F.3d at 408; *Marion Cty. Coroner's Office v. E.E.O.C.*, 612 F.3d 924,

930-31 (7th Cir. 2010). *See also Farfaras v. Citizens Bank & Trust of Chicago*, 433 F.3d 558, 566 (7th Cir. 2006). SigmaTron asserts that Gracia's only evidence of non-economic damages was her statement to the jury, "It was hard. I was just depressed. I have always been used to working." SigmaTron suggests that the award be remitted to $0 or at least be reduced significantly.

"An award for nonpecuniary loss can be supported, in certain circumstances, solely by a plaintiff's testimony about his or her emotional distress." *Tullis v. Townley Engineering & Manufacturing Co.*, 243 F.3d 1058, 1068 (7th Cir. 2001); *Merriweather v. Family Dollar Stores of Ind., Inc.*, 103 F.3d 576, 580 (7th Cir. 1996). Juries are responsible for evaluating the credibility of witnesses who testify to emotional distress, and we do not disturb those credibility determinations on appeal. *Tullis*, 243 F.3d at 1068; *Bruso v. United Airlines, Inc.*, 239 F.3d 848, 857 (7th Cir. 2001). The jurors here were able to observe Gracia as she testified and they apparently found her testimony to be sincere and sufficient to convince them that she merited the award they gave her. *Tullis*, 243 F.3d at 1068. Moreover, as the district court noted, the jury considered her testimony in the context of other evidence presented at trial: Gracia testified that she had worked continuously from the age of sixteen; SigmaTron's own witnesses conceded that, prior to her termination, Gracia had been a spectacular employee at the company; and after her termination, at the height of the recession, Gracia remained unemployed for sixteen months despite her extensive efforts to find another job. Even if Gracia's testimony regarding her distress was succinct and to the point, "brevity and self-control in a judicial proceeding need not be interpreted as a weak case, and the jury and trial

judge were entitled to take that view." *Deloughery v. City of Chicago*, 422 F.3d 611, 620 (7th Cir. 2005). It was the jury's job to gauge Gracia's distress and determine an appropriate amount to compensate her. SigmaTron has given us no reason to disturb the jury's determination.

The district court also correctly concluded that the compensatory damages awarded to Gracia were roughly comparable to other Title VII awards. In making the comparison, courts are not required to "completely analogize the damage award in this case to an identical case with either a similar or dissimilar verdict." *Farfaras*, 433 F.3d at 566.

> Awards in other cases provide a reference point that assists the court in assessing reasonableness; they do not establish a range beyond which awards are necessarily excessive. Due to the highly fact-specific nature of Title VII cases, such comparisons are rarely dispositive.

*Farfaras*, 433 F.3d at 566. Both the plaintiff and the defendant proposed cases to the court that they contended were comparable, as they did on appeal. The district court concluded that the damages awarded here were in line with those awarded in *Tullis*, 243 F.3d at 1067-68 (affirming an award in excess of $80,000 for retaliatory discharge that caused a dedicated employee who remained out of work for ten months to feel "low" and "degraded"); *Deloughery*, 422 F.3d at 620 (affirming $175,000 award of compensatory damages for emotional distress in a failure to promote case where a highly motivated female police officer with a family heritage in law enforcement was frustrated in her quest for greater responsibility simply

because she asserted her right to be free from discrimination); *Harvey v. Office of Banks & Real Estate*, 377 F.3d 698, 714 (7th Cir. 2004) (affirming compensatory damages in range of $50,000 to $150,000 for emotional distress for African American employees denied promotions on account of race); and *David v. Caterpillar*, 185 F. Supp. 2d 918, 923-24 (C.D. Ill. 2002) (remitting compensatory damage award to $50,000 for plaintiff who felt depressed, robbed and cheated by a discriminatory failure to promote). SigmaTron did not even attempt to distinguish the cases on which the district court relied. "Abuse of discretion exists only where the result is not one that could have been reached by a reasonable jurist or where the decision of the trial court strikes us as fundamentally wrong or is clearly unreasonable, arbitrary, or fanciful." *Greviskes v. Universities Research Ass'n, Inc.*, 417 F.3d 752, 758 (7th Cir. 2005). A reasonable jurist could refuse to grant a further remittitur on compensatory damages in this case and so we must affirm.

We turn to the punitive damage award of $250,000. In reviewing punitive damages, the Supreme Court has set forth three guideposts to assess the award: the degree of reprehensibility of the defendant's conduct; the disparity between the harm suffered by the plaintiff and the punitive damages award; and the difference between the award in this case and the penalties imposed in comparable cases. *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 574-75 (1996); *Kapelanski*, 390 F.3d at 534. The *BMW* case involved a fraud claim in a state where there was no statutory cap on punitive damages. We have noted that, when "Congress sets a limit, and a low one, on the total amount of damages that may be awarded, the ratio of punitive to compensatory damages in a

particular award ceases to be an issue of constitutional dignity[.]" *Lust*, 383 F.3d at 590.

> The purpose of placing a constitutional ceiling on punitive damages is to protect defendants against outlandish awards, awards that are not only irrational in themselves because out of whack with any plausible conception of the social function of punitive damages but potentially catastrophic for the defendants subjected to them and, in prospect, a means of coercing settlement. That purpose falls out of the picture when the legislature has placed a tight cap on total, including punitive, damages and the courts honor the cap.

*Lust*, 393 F.3d at 590-91. A "statutory cap suggests that an award of damages at the capped maximum is not outlandish." *AutoZone*, 707 F.3d at 840. In assessing punitive damages on appeal, "[t]he judicial function is to police a range, not a point." *Mathias v. Accor Economy Lodging, Inc.*, 347 F.3d 672, 678 (7th Cir. 2003).

SigmaTron notes that Gracia requested a total of $200,000 in punitive damages for both her sexual harassment and retaliation claims. Although the jury found in favor of SigmaTron on the sexual harassment claim, it awarded Gracia $50,000 more in punitive damages than she requested in total. SigmaTron cites that disparity as evidence that the award is the result of bias. The company asserts that the award should have been remitted to $0 or to a far lesser sum than $250,000. The company also argues that its conduct was not reprehensible or malicious, continuing to assert that Gracia was terminated not

in retaliation for reporting sexual harassment but because she knowingly allowed employees to use the incorrect solder. SigmaTron also argues that the award is disproportionate to the harm Gracia suffered, suggesting that the jury erroneously awarded punitive damages for both of Gracia's claims even though she succeeded only on the retaliation claim. Finally, the company contends that the award is inconsistent with those assessed in comparable cases.

We must begin by pointing out again that SigmaTron does not come to terms with the facts as found by the jury. Any argument that Gracia was terminated for allowing an employee to use the wrong solder was soundly rejected by the jury. SigmaTron's continued refusal to acknowledge the appropriate standard of review on appeal, even after the plaintiff cited the correct standard in her brief, is puzzling. We must assess the reprehensibility of SigmaTron's conduct by viewing the facts as the jury found them. The jury had more than enough evidence to conclude that SigmaTron terminated Gracia because she complained about sexual harassment and filed a charge with the EEOC. Upper management then created documents falsely accusing Gracia of wrongdoing and asserting that the cause of termination was legitimate. The company persisted in asserting that false reason for the termination and the false accusation of wrongdoing throughout the litigation. The jury was also aware that when Gracia tried to explain the extent of Silverman's conduct to Fairhead in the October 24th meeting, he spoke over her, denying her an opportunity to fully report the conduct. Fairhead's response to Gracia's complaint was to ignore the claim and force her to shake hands

with her harasser.[10] A scant two weeks after Gracia filed an EEOC charge asserting that Silverman sexually harassed her, Silverman himself falsely accused Gracia of wrongdoing. And Fairhead claimed to have accepted the truth of that suspect accusation, falsely claiming that Trujillo had confirmed Silverman's story. Although it was undisputed that Silverman repeatedly sent Gracia photos of partially nude women in degrading poses, the company never disciplined Silverman for this deplorable conduct towards a female subordinate. Yet it quickly terminated a stellar female employee on trumped up charges shortly after she filed a charge of sexual harassment with the EEOC.

And that version of the facts adequately supports the jury's award of punitive damages. A complaining party may recover punitive damages in a Title VII case by demonstrating that the employer "engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1); *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 535 (1999). "Applying this standard in the context of § 1981a, an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages." *Kolstad*, 527 U.S. at 536. Fairhead's conduct in response to the report of sexual harassment in the October 24th meeting and the EEOC charge meets the statutory

---

[10] Both Miedema and Fairhead conceded at trial that, when Gracia told them about Silverman's unwelcome late night party invitation, neither investigated Silverman's claim that it was David Niemi and not Silverman who had placed the call.

standard for punitive damages. As the district court noted, this standard is met when the employer engages in the act of retaliatory discharge and then makes efforts to hide it, in this case creating a false paper trail that included manufactured details of reports and meetings with Trujillo and other managers in an effort to hide the true nature of the discharge. One of the purposes of punitive damages is to limit the defendant's ability to profit from its wrongful conduct by escaping detection. *Mathias*, 347 F.3d at 677. *See also Lampley v. Onyx Acceptance Corp.*, 340 F.3d 478, 486 (7th Cir. 2003) (where the evidence supports a finding that the employer engaged in a cover-up in flagrant violation of Title VII, a large punitive damage award is warranted). Gracia thus meets the first guidepost, the degree of reprehensibility of the defendant's conduct.

The second guidepost asks us to assess the disparity between the harm the plaintiff suffered (as indicated by the compensatory damages) and the punitive damage award. As we noted, when Congress sets a limit on the total amount of damages that may be awarded, "the ratio of punitive to compensatory damages in a particular award ceases to be an issue of constitutional dignity." *Lust*, 383 F.3d at 590. In this case, the jury awarded Gracia punitive damages that are five times the amount of compensatory damages. A 5:1 ratio is well within the range we have approved in other cases. *See Mathias*, 347 F.3d at 678 (affirming a 37:1 ratio); *Kapelanski*, 390 F.3d at 534 (finding a 3.3:1 ratio easily permissible); *Lampley*, 340 F.3d at 485-86 (finding a 9:1 ratio acceptable). As we have noted, Title VII cases are very fact-specific, and we will not normally disturb an award of damages at or under the statutory cap because the decision is largely within the province of the jury.

*Lampley*, 340 F.3d at 486; *Fine v. Ryan International Airlines*, 305 F.3d 746, 755 (7th Cir. 2002).

Finally, we are aware of no rule prohibiting a jury from awarding more in damages than a plaintiff requests and SigmaTron cites no authority for this claim. *See, e.g., Dresser Industries, Inc. v. Gradall Co.*, 965 F.2d 1442, 1447 (7th Cir. 1992) (affirming a jury award that exceeded the plaintiff's request). So long as the award has a reasonable basis in the evidence, a jury has wide discretion in determining damages. *Id*. "This is especially so where the trial judge, who had the opportunity to hear the evidence and observe the jury, has seen fit to uphold the award in the face of a post-trial challenge." *Id*. We also note that it is unlikely the jury was biased in Gracia's favor as it found against her on the sexual harassment claim. Apparently, the jury simply had a different view than the plaintiff regarding the amount necessary to punish SigmaTron's conduct and deter future wrongdoing. *Merriweather*, 103 F.3d at 581 (noting that we will set aside an award of punitive damages only if it exceeds an amount necessary to serve the objective of deterrence and punishment). We see no reason to disturb the jury's award here.

## C.

Finally, in kitchen-sink fashion, SigmaTron argues that it is entitled to a new trial because (1) the jury awarded excessive damages; (2) the district court permitted a venire person to remain on the jury who should have been stricken for cause; (3) SigmaTron was wrongly prohibited from presenting a witness; and (4) Gracia presented a doctored and prejudicial exhibit to

the jury. None of these issues has any merit and we will address them summarily.

As we have just concluded, the jury did not award excessive damages. The district court did not abuse its discretion in refusing to exclude the prospective juror because nothing the juror said evinced an irrational or unshakeable bias that would prevent him from ruling impartially on the case. *Griffin v. Bell*, 694 F.3d 817, 826 (7th Cir. 2012). Nor did the court abuse its discretion in barring SigmaTron from presenting a witness whose testimony the court deemed cumulative under Federal Rule of Civil Procedure 403. Moreover, SigmaTron failed to preserve the alleged error for appeal when it failed to make an offer of proof regarding the excluded witness's expected testimony. *Wilson v. City of Chicago*, 758 F.3d 875, 885 (7th Cir. 2014); Fed. R. Evid. 103(a)(2). And finally, the district court did not abuse its discretion in allowing Gracia to present the challenged exhibit. The exhibit consisted of one of the explicit photos that Silverman had emailed to Gracia, but for the trial version of the email, the plaintiff had removed the forwarding chain in order to hide the fact that Gracia had forwarded the email to her attorney. The court remedied the matter by allowing the defendant to present the full email and cross-examine the plaintiff on the matter. Any error in allowing the exhibit into evidence was harmless in light of the court's corrective actions. There is no merit in any of SigmaTron's remaining arguments and no new trial is warranted.

AFFIRMED.