In the

# United States Court of Appeals

## For the Seventh Circuit

_____

Nos. 16-4153 & 18-2990

PRISCILLA RAINEY,

*Plaintiff-Appellee,*

*v.*

JAYCEON T. TAYLOR,

*Defendant-Appellant.*

_____

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 15 C 6844 — **Gary Feinerman**, *Judge.*

_____

ARGUED MARCH 25, 2019 — DECIDED OCTOBER 17, 2019

_____

Before WOOD, *Chief Judge*, and FLAUM and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge.* Rapper Jayceon Taylor, better known as "The Game," starred in a VH1 television show called *She's Got Game*, an imitation of the long-running reality dating series *The Bachelor*. While filming in Chicago in 2015, Taylor took contestant Priscilla Rainey on an off-camera date at a suburban sports bar. There Taylor sexually assaulted her by repeatedly lifting her skirt, grabbing her bare buttocks and

vagina, and "juggling" her breasts in front of a large crowd of onlookers.

Rainey sued Taylor for sexual battery. Taylor did not take the litigation seriously. He evaded process, trolled Rainey on social media, dodged a settlement conference, and did not bother to show up at trial. His attorney asked for a continuance, but the judge denied that request, dismissing Taylor's proffered excuse as an elaborate ruse. The judge instructed the jurors that they could infer from Taylor's absence that his testimony would have been unfavorable to him. The jury returned a verdict for Rainey, awarding $1.13 million in compensatory damages and $6 million in punitive damages.

Taylor moved for a new trial, challenging the denial of a continuance, the missing-witness instruction, and the general weight of the evidence. Alternatively, he sought a remittitur of damages. The judge denied the motions. Taylor appeals, reprising the arguments in his posttrial motions and adding a claim of evidentiary error.

We affirm. District judges have wide discretion to manage their proceedings and resolve evidentiary issues, and the rulings here lie well within that discretion. Taylor has only himself to blame for the missing-witness instruction, which was plainly justified. The verdict is well supported by the evidence, and we see no reason to disturb the jury's determination of damages. The compensatory award is not excessive under Illinois law, and the punitive award survives constitutional scrutiny.

## I. Background

Jayceon Taylor—a/k/a "The Game"—is an internationally known, Grammy-nominated rap artist. For a brief time, he

was also a minor reality-show star. *Marrying the Game* ran on VH1 from 2012–2014 and chronicled the collapse of his engagement to his longtime girlfriend and mother of his children. When that show ended, his celebrity friends helped him create another VH1 reality show called *She's Got Game*, which featured a competition among women who might be a match for him.

Priscilla Rainey, a realtor and entrepreneur from Florida, was a contestant on *She's Got Game*. In May 2015, while the show was filming in Chicago, Rainey and Taylor went on an off-camera date in apparent violation of the competition rules. Taylor took Rainey to a suburban sports bar, and at one point during the evening, they were on an elevated stage in full view of club patrons. With a stage light shining on them, Taylor lifted Rainey's skirt and grabbed her bare buttocks and vagina. She tried to break away, but he did it again—this time lifting her rear end up and exposing her intimate parts to the gawking crowd. As Rainey struggled to push him away and lower her skirt, he grabbed her bare buttocks and vagina a third time. He also grabbed and "juggled" her breasts for the entertainment of the onlookers.

Three days later Rainey confronted Taylor about the assault. The two were on the show's tour bus with other cast members, and a film crew caught the entire exchange on camera. The video begins with another contestant announcing that Rainey had a secret date with Taylor (that's cheating, as we said) and returned to the hotel visibly upset. Rainey responded that she told the crew about it but no one else. Taylor then reminded her that he had instructed her not to mention it to anybody—and "don't mention it means don't mention it." A heated argument ensued. Rainey re-

peatedly tried to tell him that she had a "problem" with what had happened and was "bothered" by it. Taylor angrily commanded her to keep quiet: "What you can do is be a woman and shut up, like you can shut up right now." She did not shut up. Instead, she described the assault in graphic detail. After an expletive-laden exchange, Taylor ordered her to "[g]et off this bus before you get your ass strangled" and threatened to "choke [her] ass up."

In August 2015, just before the show's debut, Rainey sued Taylor for sexual battery in federal court in Chicago. Taylor repeatedly evaded service and otherwise tried to obstruct and delay the litigation. Five process servers across three states made multiple attempts to serve him with the complaint and summons. One process server alone made 41 unsuccessful attempts to serve Taylor at his California home. The district judge authorized alternative service. In the meantime, the suit was widely reported in the press and generated lots of chatter on social media.

Taylor did not answer or otherwise plead, so on February 1, 2016, the judge entered a default under Rule 55(a) of the Federal Rules of Civil Procedure. Ten days later Florida attorney Andrew Williams appeared for Taylor and moved to quash service and set aside the default. The judge denied the motion to quash but set aside the default and scheduled trial for November 14, 2016. A magistrate judge set a settlement conference for June 16 and ordered Rainey and Taylor to appear in person. On June 2 Taylor moved to reschedule the settlement conference, feigning concern for his safety based on Chicago's gun-violence problem:

> This past Memorial Day Weekend sadly almost 70 people were shot in the city of Chicago. Due to high volume of violence and likelihood of reprisals due to such violence the Defendant has grave concerns for his safety and for those who assist him during his travels due to his celebrity status.

The magistrate judge canceled the settlement conference for other reasons. It was never rescheduled.

Taylor's dilatory conduct didn't stop there. In July he moved to transfer the case to either the Central District of California or the Southern District of Florida. The judge denied the motion. In September he moved to continue the trial. The judge denied that motion as well. In October he again moved for a continuance, which the judge likewise denied. Meanwhile, Taylor railed against the lawsuit on social media, insulting Rainey in exceedingly vulgar terms.

Jury selection commenced as scheduled on Monday, November 14. Taylor did not show up. Williams, his attorney, assured the court that his client would be present the next day. When trial resumed on Tuesday, Taylor was again absent. Williams asked for a continuance, saying that he had learned on Monday night that Taylor had an emergency dental procedure that day. He produced a note from a California dental clinic and invited the judge to call to confirm this excuse. The judge made the call, and an endodontist explained that Taylor had "basically more or less a root canal procedure, two of them" on Monday. It was not clear from either the note or the call whether the dental problem was a longstanding one or a sudden onset. The endodontist explained that he was not Taylor's regular

dentist and did not know his history; rather, Taylor had called his emergency line at about 6 p.m. on Sunday evening.

Rainey's counsel responded by submitting several screenshots from Taylor's Snapchat account. The photos depicted Taylor smoking something in a dark room under pink neon lights at 2:44 a.m. on Monday, November 14. As the judge described the images, it looked as if Taylor was "out partying" in the middle of the night just a few hours after he placed a call to an "emergency dental hotline" and a few hours before he was due in court in Chicago. The judge denied the continuance motion, stating that Taylor's actions were "indicative of somebody who had no intention of appearing" at trial.

On Wednesday Taylor again did not appear. Williams renewed his continuance motion and offered copies of airline and hotel reservations as evidence of Taylor's intent to attend trial. The judge noted that the flight times—leaving Los Angeles on Monday at 11:25 p.m., arriving in Chicago at 5:12 a.m. on Tuesday; and leaving Chicago on Wednesday at 7:50 p.m.—didn't align with the expected week-long trial schedule. And the lone hotel room listed on the reservation couldn't accommodate Taylor and the three people traveling with him. The judge again denied the continuance motion, concluding that Taylor's "dental emergency" excuse was a "ruse." Trial continued through Friday. Taylor never showed up.

Among other evidence, Rainey offered her own testimony about the sexual assault and its aftermath; the video of the tour-bus confrontation; and documentary and other evidence of damages, including testimony from a colleague

who corroborated the emotional pain she suffered and the lingering effects of the assault on her personal and professional life. Williams put on a brief defense for his missing client, including calling a witness who testified from California by videoconference. Tellingly, he did not ask the court's permission for Taylor to testify by videoconference.

When both sides rested on Friday, Williams renewed the continuance motion, citing the same grounds as before. He did not submit an affidavit from Taylor or a dental professional to substantiate his claim that the dental procedure was an emergency. The judge again denied the motion.

In light of Taylor's absence, the judge gave the following jury instruction: "Defendant Jayceon Terrell Taylor was mentioned at trial but did not testify in person in court. You may, but are not required to, assume that Mr. Taylor's testimony would have been unfavorable to Mr. Taylor." The jury returned a verdict for Rainey, awarding $1.13 million in compensatory damages and $6 million in punitive damages.

Taylor moved for a new trial on several grounds. He again attacked the denial of a continuance and the related missing-witness instruction. He also argued that the jury's verdict was against the weight of the evidence. Alternatively, he sought a remittitur of damages. The judge denied the motions and entered judgment on the jury's verdict.

## II. Discussion

Taylor challenges three of the judge's rulings during trial: (1) the denial of a continuance; (2) the decision to give the missing-witness instruction; and (3) the admission of the video of the tour-bus confrontation. He also repeats his posttrial claim that the jury's verdict is against the weight of

the evidence. Alternatively, he argues that the compensatory and punitive awards are excessive and should be vacated or reduced.

## A. Refusal to Reschedule the Trial

Taylor's first argument is a challenge to the denial of his several continuance motions. We review continuance rulings under the deferential abuse-of-discretion standard. *Research Sys. Corp. v. IPSOS Publicité*, 276 F.3d 914, 919 (7th Cir. 2002). "The decision concerning whether to grant a continuance is left to the broad discretion of the district court," *id.* (quotation marks omitted), and "[t]he occasions for intervention are rare," *United States v. Winbush*, 580 F.3d 503, 508 (7th Cir. 2009) (quotation marks omitted).

The judge was well within his discretion to refuse to grant a continuance. Taylor's claim that he had a dental emergency on Sunday was not substantiated by reliable evidence and was hard to take seriously given Taylor's evasive litigation conduct and the Snapchat photos. A good-faith litigant would have notified his counsel immediately if a true emergency prevented his appearance at trial. Yet Williams did not learn about Taylor's dental procedure until Monday night. And he submitted no affidavit from Taylor or a dental professional to substantiate the claimed emergency. When Taylor was still a no-show by mid-week, Williams produced airline and hotel reservations in a last-ditch effort to show that his client intended to attend the trial. But the dates did not match the trial schedule, and the lone room reservation was obviously insufficient to accommodate everyone in Taylor's travel entourage.

The Snapchat posts, moreover, gave the judge good reason to doubt that Taylor's dental issue was a true emergency. The screenshots showed Taylor smoking something under pink neon lights in the middle of the night just a few hours after he called a dental emergency hotline and a few hours before he was due in court in Chicago. Add to this mix Taylor's evasion of service and other dilatory conduct during the litigation, and the judge was quite understandably unconvinced.

Taylor insists that the note from the dentist's office and the judge's phone call to the endodontist should have been enough to win a continuance. But the judge was justified in treating this information with skepticism. It remained unclear whether Taylor's dental issue was a previously known condition or a sudden-onset emergency—a material fact in evaluating whether this was a good-faith excuse for skipping trial or just a ruse. Taylor also argues that the judge gave too much weight to the Snapchat posts. He objects that the screenshots are not clear enough to establish that he is in fact the person in the photos. And he tries to create doubt by noting that his staff can also post to his Snapchat account. But it's not our role to reweigh the evidence. The judge carefully considered the entire record and made a reasonable judgment that Taylor was unjustifiably absent. We find no error.

## B. Missing-Witness Instruction

Relatedly, Taylor challenges the missing-witness instruction. This argument is woefully undeveloped; no legal authority is cited. We could call that a waiver, *see Lewis v. Mills*, 677 F.3d 324, 332 (7th Cir. 2012), but the argument also clearly fails on the merits. District judges have broad discre-

tion to decide whether to give a missing-witness instruction. *Hoffman v. Caterpillar, Inc.*, 368 F.3d 709, 716 (7th Cir. 2004). We've said the instruction is appropriate if the proponent establishes that "the missing witness was peculiarly in the power of the other party to produce." *Oxman v. WLS-TV*, 12 F.3d 652, 661 (7th Cir. 1993). If "the witness is physically available only to the opponent," the instruction is warranted. *Id.*

The judge used our pattern missing-witness instruction. *See* FEDERAL CIVIL JURY INSTRUCTIONS OF THE SEVENTH CIRCUIT § 1.19 (2005 rev.). Though it's framed for use in a case involving a missing *nonparty* witness, the instruction certainly fits this situation. Taylor was in complete control of his own appearance at trial. His choice to stay away for the duration of the trial carried consequences, one of which was the likelihood that the judge would give a missing-witness instruction. The judge was on solid ground in giving this instruction.

## C. Video of the Tour-Bus Confrontation

Over Taylor's objection, the judge admitted the video of the tour-bus confrontation between Rainey and Taylor.[1] Taylor renews his objection on appeal, arguing that the video was unfairly prejudicial under Rule 403 of the Federal Rules of Evidence. *See* FED. R. EVID. 403 (permitting the district court to exclude relevant evidence "if its probative value is substantially outweighed by a danger of … unfair prejudice"). We give special deference to the judge's applica-

---

[1] Though we use the singular "video," we note for completeness that it was actually a combination of three recordings, each of which captured the tour-bus confrontation from a different angle.

tion of Rule 403's balancing test; we will reverse only if "no reasonable person could take the view adopted by the trial court." *Davies v. Benbenek*, 836 F.3d 887, 889 (7th Cir. 2016) (quotation marks omitted).

Taylor doesn't come close to clearing this high bar. The video had obvious probative value on the key question before the jury: whether to credit Rainey's testimony that Taylor sexually assaulted her. Taylor's reaction when she confronted him is telling. He angrily ordered her to "shut up" just as she was on the brink of divulging what happened during the unauthorized private date. When she finally spilled the details of the assault, there is no denial; instead, Taylor erupted in a torrent of profanities, ordered her off the bus, and threatened to "strangle" and "choke" her. This conduct reflects consciousness of guilt.

The video was also relevant as impeachment evidence. Though Taylor did not appear at trial, Rainey played parts of his recorded deposition testimony for the jury, including a passage in which he denied that Rainey confronted him about the assault on the tour bus. The video exposes this deposition testimony as false.

Finally, as the judge aptly noted, the video helped the jury to evaluate the parties' body language and credibility soon after the assault: "The plaintiff's and the defendant's interactions after … the incident … can be probative for the jury in deciding who is telling the truth, what they say to one another, how they react, their facial expressions." We agree with the judge's assessment that this video evidence had substantial probative value.

And the judge appropriately balanced the probative value against the risk of unfair prejudice. Taylor complains that the jury saw a "scuffle" featuring pervasive foul language. But the recording captured *both parties* using profanity and engaging in a scuffle. Taylor also suggests that the jury might have been distracted or misled by the slang he used during the confrontation. But he does not say how his language might have been misinterpreted. Like the district judge, we see little risk that the video could have induced the jury to decide this case on an improper basis. *United States v. Klebig*, 600 F.3d 700, 713 (7th Cir. 2009).

## D. Weight of the Evidence

Taylor next asks us to order a new trial because the jury's verdict is against the weight of the evidence. Once again, our review is deferential; we will reverse the judge's denial of a new trial only if we find an abuse of discretion. *Clarett v. Roberts*, 657 F.3d 664, 674 (7th Cir. 2011). "A new trial should be granted only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." *Id.* (quotation marks omitted).

This verdict is neither conscience-shocking nor unjust. Quite the contrary. Rainey's testimony about the sexual assault went largely unimpeached. A security guard for the VH1 show provided some corroboration, testifying that he encountered Rainey crying in the hotel hallway soon after her return from the sports bar. We've already described the strong probative value of the tour-bus confrontation video. And the missing-witness instruction permitted the jury to draw an adverse inference from Taylor's nonappearance. The jury's liability finding is well supported by the evidence.

### E. Compensatory Damages

Next up is Taylor's claim that the compensatory damages are excessive. We review the judge's denial of a remittitur for abuse of discretion. *See Gracia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010, 1022 (7th Cir. 2016). In rejecting Taylor's argument, the judge noted some confusion in our caselaw about the applicable standard for reviewing a jury's compensatory award in cases involving state-law claims. He's right; we haven't always been clear about whether state or federal law controls. *Compare Naeem v. McKesson Drug Co.*, 444 F.3d 593, 611 (7th Cir. 2006) (applying state law), *with Jutzi-Johnson v. United States*, 263 F.3d 753, 759 (7th Cir. 2001) (suggesting in dicta that the federal standard applies); *see also Arpin v. United States*, 521 F.3d 769, 777 (7th Cir. 2008) (same). We take this opportunity to clarify.

The Supreme Court has held that state-law standards for evaluating a jury's compensatory award are substantive, not procedural, for purposes of *Erie* analysis. *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 432 (1996). Accordingly, when a federal jury awards compensatory damages in a state-law claim, state law determines whether that award is excessive. *Smart Mktg. Grp. v. Publ'ns. Int'l Ltd.*, 624 F.3d 824, 832 (7th Cir. 2010); *accord* 19 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 4511 (3d ed. 2016).

So Illinois law controls. The main difference between the Illinois and federal standards is that the latter considers whether the compensatory award is "roughly comparable to awards made in similar cases," *Pickett v. Sheridan Health Care Ctr.*, 610 F.3d 434, 446 (7th Cir. 2010), while "the clear weight of Illinois authority … reject[s] the 'comparison' concept,"

*Tierney v. Cmty. Mem'l Gen. Hosp.*, 645 N.E.2d 284, 289 (Ill. App. Ct. 1994); *accord Richardson v. Chapman*, 676 N.E.2d 621, 628 (Ill. 1997). Under Illinois law it's neither necessary nor appropriate to evaluate a jury's compensatory award against awards in similar cases; a comparative analysis is not part of the state framework. Rather, remittitur is appropriate "only when a jury's award falls outside the range of fair and reasonable compensation, appears to be the result of passion or prejudice, or is so large that it shocks the judicial conscience." *Klingelhoets v. Charlton-Perrin*, 983 N.E.2d 1095, 1113 (Ill. App. Ct. 2013). Conversely, remittitur "should not be ordered if the award falls within the flexible range of conclusions which can reasonably be supported by the facts." *Id.* at 1113–14 (quotation marks omitted).

The jury's $1.13 million award represents a fair and reasonable compensation for this intentional tort; it also finds adequate support in the facts established at trial.[2] The jury heard extensive testimony from Rainey about the severe emotional distress she experienced and her subsequent treatment for anxiety, nightmares, and depression. She also explained how Taylor's aggressive response when confronted on the tour bus made her feel "violated, degraded, [and] attacked" all over again. Her business partner testified that the assault took a serious toll on Rainey's personal and professional life. And the jury was given documentary evidence in the form of her medical history and therapy

---

[2] The award is the sum of seven individual compensatory awards: $6,100 for past medical expenses; $24,000 for future medical expenses; $500,000 for future loss of normal life; $100,000 for past pain and suffering; $200,000 for future pain and suffering; $100,000 for past emotional distress; and $200,000 for future emotional distress.

bills. We owe "a decent respect for the collective wisdom of the jury," *Mejia v. Cook County*, 650 F.3d 631, 633 n.1 (7th Cir. 2011) (quotation marks omitted), and there's more than enough here to support its assessment of compensatory damages.

Taylor challenges the compensatory award in three ways. First, he claims it lacks sufficient evidentiary support because none of Rainey's treating physicians or therapists testified at trial. But Illinois doesn't require expert testimony to establish damages of this kind. *See, e.g.*, *Thornton v. Garcini*, 928 N.E.2d 804, 809 (Ill. 2010) ("The absence of medical testimony does not preclude recovery for emotional distress."); *Rainey v. City of Salem*, 568 N.E.2d 463, 469 (Ill. App. Ct. 1991) (explaining that expert testimony is not necessary to prove future medical expenses). Next, Taylor criticizes Rainey's testimony as "logically insufficient to support her battery claims and damages sought." This is just a rehash of his argument against liability. And finally, Taylor asserts that the award is out of line with awards made in similar cases. But as we said, Illinois law rejects the use of comparisons.

### F. Punitive Damages

Lastly, Taylor claims that the punitive award of $6 million violates the Due Process Clause. We review this question of law de novo. *Estate of Moreland v. Dieter*, 395 F.3d 747, 756 (7th Cir. 2005). The Supreme Court has established three "guideposts" for testing an award of punitive damages for compliance with due process: (1) the reprehensibility of the defendant's conduct; (2) the disparity between the actual harm suffered and the punitive award; and (3) the difference between the award authorized by the jury and the penalties

imposed in comparable cases. *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996). Our evaluation of these factors favors affirming this award.

The first factor—the reprehensibility of the defendant's conduct—is the most important. *Id.* We consider whether

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003). We presume that Rainey was made whole by the compensatory award, so punitive damages are justified only if Taylor's culpability "is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." *Id.*

That standard is clearly satisfied here. Taylor's conduct was deeply reprehensible. He lifted Rainey's skirt, grabbed her bare buttocks and vagina, and exposed these most intimate of her body parts to a large crowd—not once but three times. He also "juggled" her breasts as if to entertain the onlookers. This was a particularly degrading act of sexual objectification. The conduct satisfies several of the variables identified in *State Farm*: (1) it was an intentional infliction of physical harm; (2) it demonstrated a reckless disregard for Rainey's health and safety; and (3) Taylor

continued to grope and expose Rainey's most intimate body parts even after she protested, so his misconduct was both repetitious and malicious. In short, Taylor knew Rainey "was suffering but continued to abuse" her. *See Estate of Moreland*, 395 F.3d at 757 (observing that the "prolonged nature" of an assault "compounded" the plaintiff's suffering and "exacerbate[d] the reprehensibility of [the defendants'] behavior").

That Taylor's cruelty continued after the assault compounded Rainey's pain and humiliation. We've already described his aggressive response when she confronted him on the tour bus. But that's not all. Taylor also launched a series of vile public attacks against Rainey on social media. For instance, after she filed this suit, Taylor viciously insulted her in a public Instagram post. Depicting himself as a fighter wearing boxing gloves, Taylor called Rainey a "thirsty Gatorade mascot of a transvestite"; accused her of having "a history of a lot of other 'Tranny Panty' activity"; and claimed that she sued him because she was eliminated from the *She's Got Game* competition. (There's more, but we see no need to repeat Taylor's most vulgar insults.) The Instagram post concludes with this: "See you in court Mister Rainey." On these facts it's abundantly clear that Taylor's conduct warranted further sanction.

Moving to the second guidepost, the ratio between the compensatory and punitive damages is not unreasonable. The Supreme Court has declined to set a fixed ratio to limit punitive damages; indeed, the Court's observations on this subject do not provide much guidance. *Compare State Farm*, 538 U.S. at 425 (noting that "few awards exceeding a single-digit ratio between punitive and compensatory damages … will satisfy due process"), *with Gore*, 517 U.S. at 581 (suggest-

ing that a punitive award four times larger than the compensatory award "might be close to the line … of constitutional impropriety") (quotation marks omitted). Our job is to "police a range, not a point." *Mathias v. Accor Econ. Lodging, Inc.*, 347 F.3d 672, 678 (7th Cir. 2003).

The punitive award is approximately six times the compensatory award. We've upheld similar ratios in the past. *See, e.g., Gracia*, 842 F.3d at 1025 (approving a 5:1 ratio); *Neuros Co. v. KTurbo, Inc.*, 698 F.3d 514, 520 (7th Cir. 2012) (affirming a 5:1 ratio while opining that the award was still "too small"). We've even upheld higher ratios. *See, e.g., Mathias*, 347 F.3d at 676–78 (affirming a 37:1 ratio); *Lampley v. Onyx Acceptance Corp.*, 340 F.3d 478, 485–86 (7th Cir. 2003) (finding a 9:1 ratio acceptable).

To be sure, many of these cases involved much smaller compensatory awards, which is a relevant factor. *See State Farm*, 538 U.S. at 425 (noting that when "compensatory damages are substantial," then a "lesser ratio" can be justified under the Constitution). But the truly egregious nature of Taylor's conduct supports the size of this punitive award even with the significant compensatory award. The sheer maliciousness of the tort is extreme. And the public humiliation of this assault, combined with Taylor's post-assault insults and threats, warrant a substantial punitive award.

The final guidepost—the difference between the award authorized by the jury and the penalties imposed in comparable cases—doesn't change our conclusion. Taylor's entire argument on this point comprises only a few sentences, so again we could find a waiver. But even if the punitive award is higher than those in comparable cases, this guidepost generally deserves less weight than the other two. *Kemp v.*

*AT&T Co.*, 393 F.3d 1354, 1364 (11th Cir. 2004); *see also Willow Inn, Inc. v. Pub. Serv. Mut. Ins. Co.*, 399 F.3d 224, 238 (3d Cir. 2005) ("[W]e are reluctant to overturn the punitive damages award on [the] basis [of the third guidepost] alone."). The punitive award raises no constitutional concerns.

AFFIRMED